UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT MAJCHRZAK,                                    Case No. 10-13971
       Plaintiff,

                                     Honorable Patrick J. Duggan

v.

COUNTY OF WAYNE and KERREEN
CONLEY,
       Defendants.
_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on December 22, 2011.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                  U.S. DISTRICT COURT JUDGE

On October 5, 2010, Robert Majchrzak ("Plaintiff") filed this lawsuit, alleging that

Wayne County ("the County") and Kerreen Conley wrongfully terminated his employment

in response to his raising concerns about faulty equipment at a sewage pumping station.

Plaintiff and Defendants filed cross-motions for summary judgment pursuant to Federal

Rule of Civil Procedure 56, and these motions are presently before the Court. The matter

has been fully briefed, and the Court heard oral argument on September 8, 2011. For the

reasons stated below, the Court denies Defendants' motion and grants Plaintiff's motion.

## I. Factual and Procedural Background

Plaintiff was formerly employed as a pump station mechanic at the Milk River

Pumping Station ("MRPS"), a sanitary sewage pump station located in northeast Wayne

County, Michigan.  MRPS serves the cities of Grosse Pointe Woods, Harper Woods, and St. Clair Shores.  During heavy rains, the water level rises in an underground storage area known as the "wet well."  When the wet well reaches a certain level, water is pumped to a Detroit wastewater treatment plant, preventing the flooding of basements in nearby homes. The Michigan Department of Environmental Quality has issued a permit authorizing MRPS to discharge water into the Milk River in accordance with certain limitations and monitoring requirements.[1]  MRPS is required by law to comply with the permit's terms. *See* Michigan Compiled Laws § 324.3109.

Wayne County operates MRPS and sets billing rates for customer communities. Wayne County also prepares the MRPS budget, although budget oversight responsibility lies with the Milk River Intercounty Drainage District (the "Drainage District"), a drainage district created pursuant to Michigan's Drain Code of 1956, Michigan Compiled Laws § 280.101 *et seq.*  The Drainage District is led by a five-member Drainage Board consisting of one representative each from Wayne County, Macomb County, and the Michigan Department of Agriculture, plus two rotating members from the cities of Harper Woods, Grosse Pointe Woods, and St. Clair Shores.  In July 2010, the Board's members were Michael Gregg, from the Michigan Department of Agriculture; Butler Benton, Jr., from the Wayne County Department of Public Services; Gene Schabath, from the Macomb County Public Works Office; Robert Hinson, the Mayor of St. Clair Shores; and James Leidlein, the Manager of the City of Harper Woods.  As part of the annual budgeting

---

[1] This permit was issued under a standard known as the National Pollutant Discharge Elimination System ("NPDES"), and is referred to as "NPDES Permit No. MI0025500."

process, Wayne County invites representatives of the customer communities to an informal meeting to review the budget before it is presented to the Drainage Board. The purpose of this meeting is to review the budget and advise the communities of significant changes.

On July 1, the informal budget meeting was held in the City of Grosse Pointe Woods. Dennis Scully presented the budget for Wayne County, and attending as representatives of the customer communities were Laura Stowall for Harper Woods and Al Fincham for Grosse Pointe Woods. Plaintiff took four hours of vacation time to attend the meeting, allegedly appearing without invitation. Appearing with Plaintiff was Irene Maguet, a St. Clair Shores resident who frequently attends Drainage Board meetings and has been called "the watch-dog for the Milk River." Conley Dep. 39:24, Mar. 31, 2011.

Plaintiff claims that he introduced himself to the meeting attendees as a citizen of Macomb County who worked at the Milk River Pump Station. Majchrzak Dep. 127:24-128:1, Mar. 7, 2011. Fincham and Stowall did not recall Plaintiff stating that he was a concerned citizen. Stowall Dep. 29:1-13, Apr. 26, 2011; Fincham Dep. 36:16-24, Apr. 26, 2011. Attendees were handed copies of the following memo Plaintiff had drafted:

To: Inter-County Drainage Board

Date: July 1, 2010

Equipment that is out of service or out of commission at the Milk River Pumping Station:

1)      The #7 storm pump - out of commission since May 1, 2008.

2)      The #3 storm pump - out of service since October 1, 2009.

3

3)      The #1 storm pump can only be started manually.

4)      The automatic inlet valves for #2, #5 & #6 chlorine pumps are out of service.

5)      The effluent sample pump is out of commission (It is used to safely get wastewater samples per the N.P.D.E.S. permit).

6)      Two of the four basin dewatering pumps are out of service since April 1, 2010.

7)      Basin #1 flushing system is out of commission since 2005.  (There is 10" or more of sludge in the basin now)

8)      Twenty five percent of basin #2 flushing valves are out of service since 2005.  (There are pockets of sludge 10" or more in basin #2 right now).

9)      The #1 & #2 aeration blowers are out of commission since January 27, 2009.  (#2 electrical panel started on fire - cause was not determined?)

10)     Milk River outbound flow-meter is out of service since April 2010.

11)     One of the three main aeration discharge pipes is out of service since 2007 (Pipe blown apart at coupling).

12)     Why was the snowplowing at Milk River contracted out last year?  Milk River has a 4x4 truck with a plow and has always been capable of doing it themselves.  The contractor was always a day late and only did 70% of what they were contracted to do.

13)     Why was the grass cutting/trimming contracted out ($4,000) last June of 2009 at Milk River when a new 50" Troy-built riding mower and a 20" Snapper push mower was purchased the previous year specifically for Milk River personnel.  (The equipment was taken to Wyandotte Wastewater Treatment facility last fall so it wouldn't disappear).  The County waited until the end of April 2010 to get bids to cut the grass (the grass was already 6"-8" tall.  A bid of $8,000 was beyond the County's approval.  So the 50" Troy-built mower was brought back and the 2 employees were told to cut the grass.  The grass was 10"-12" high and no 20" Snapper push mower has returned yet.  It has been asked to be returned twice.

14)     The "County" has implemented a preventative maintenance program,

which is to be commended.  Although due to budget cuts, a $100 million dollar deficit and a reduction in staffing it is unable to perform the repair or maintenance of its <u>critical</u> equipment/systems.  This is being brought to your attention because the operational capability of certain systems is compromised.  If they continue to be neglected the duties and responsibility of the "operator" is in jeopardy.  It is highly recommended that a quarterly meeting between "upper" management and its employees that "operate" the facilities take place.  Communication, establishing a short term/long term "plan" with the people that operate Wayne County's facilities have never been tried.  Why not involve the "employee" that operates the facility daily?  The County expects accountability and responsibility from their employees - shouldn't the employee receive the same.

Pl.'s Br. Supp. Mot. Summ. J. Ex. A.  Meeting attendees apparently questioned Plaintiff about the contents of this memo.

After the meeting, Scully advised Kerreen Conley, Wayne County's Facilities Management Director, of Plaintiff's attendance at the meeting and his 14-point memo.  Conley, Benton, and Wayne County Superintendent Firooz Fath-Azam investigated the memo for accuracy.  This investigation concluded that although many of the statements regarding equipment failures were correct, MRPS was in compliance with all operational requirements.

On July 7, 2010, Conley terminated Plaintiff's employment.  His discharge notice provides the following reason for termination:

On July 1, 2010 Robert Majchrzak attended a meeting for which he was not invited, made false claims (policy 3.01) and engaged in an activity that was a direct conflict of interest (policy 3.06), misrepresented information that was detrimental to the reputation and operations of the County.

Pl.'s Br. Supp. Mot. Summ. J. Ex. F.

On October 5, 2010, Plaintiff filed this action, seeking damages under Michigan's

Whistleblowers' Protection Act ("WPA"), Michigan Compiled Laws § 15.361 *et seq.*, and

42 U.S.C. § 1983 for violation of his rights under the First Amendment to the United

States Constitution.  Defendants have moved for summary judgment on Plaintiff's claims

pursuant to Federal Rule of Civil Procedure 56, and Plaintiff has filed a motion for partial

summary judgment as to liability.

## II. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any

material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as

a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505,

2512 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates

summary judgment against a party who fails to establish the existence of an element

essential to that party's case and on which that party bears the burden of proof at trial.  *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  The movant

has an initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at

323, 106 S. Ct. at 2553.

Once the movant meets this burden, the non-movant must come forward with

specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).  To demonstrate a

genuine issue, the non-movant must present sufficient evidence upon which a jury could

reasonably find for the non-movant; a "scintilla of evidence" is insufficient.  *Liberty*

*Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Id.* at 255, 106 S. Ct. at 2513.  The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *Id.*, 106 S. Ct. at 2514.

### III. Discussion

### A. Whistleblowers' Protection Act Claim

"The WPA was enacted to encourage employees to assist in law enforcement and to protect employees who participate in whistleblowing activities." *Trepanier v. Nat'l Amusements, Inc.*, 250 Mich. App. 578, 584, 649 N.W.2d 754, 758 (Mich. Ct. App. 2002). The statute provides in pertinent part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation promulgated pursuant to the laws of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Michigan Compiled Laws § 15.362.  "To establish a prima facie case, it must be shown that (1) the plaintiff was engaged in protected activity as defined by the Whistleblowers' Protection Act, (2) the plaintiff was discharged, and (3) a causal connection existed between the protected activity and the discharge." *Shallal v. Catholic Soc. Servs.*, 455 Mich. 604, 610, 566 N.W.2d 571, 574 (Mich. 1997)  If Plaintiff succeeds in establishing his prima facie case, the burden shifts to Defendants to articulate a legitimate reason for

the discharge.  *See Phinney v. Verbrugge*, 222 Mich. App. 513, 563, 564 N.W.2d 532, 558

(Mich. Ct. App. 1997).  If Defendants carry this burden, Plaintiff may prevail by proving

that the reason offered was a pretext for the discharge.  *Id.* at 563, 564 N.W.2d at 558.

There is no dispute that Plaintiff was discharged, and his disciplinary notice clearly

provides that he was discharged for his actions at the July 1, 2010 meeting.  The parties

disagree as to whether those actions constitute protected activity under the WPA.  "An

employee is engaged in protected activity under the Whistleblowers' Protection Act who

has reported, or is about to report, a suspected violation of law to a public body."  *Shallal*,

455 Mich. at 610, 566 N.W.2d at 575.  "The suspected violation of the law is judged on a

subjectively reasonable standard."  *Smith v. Gentiva Health Servs., Inc.*, 296 F. Supp. 2d

758, 762 (E.D. Mich. 2003) (citing *Melchi v. Burns Int'l Sec. Servs., Inc.*, 597 F. Supp.

575 (E.D. Mich. 1984)).

The evidentiary record demonstrates that Plaintiff reasonably believed that the

County's conduct violated the law.  Plaintiff's memo cites the NPDES permit and states

that neglect of critical equipment and systems jeopardized the County's ability to fulfill its

duties as the operator of MRPS.  Failure to comply with permit requirements is a violation

of Michigan statute.  *See* Michigan Compiled Laws § 324.3109.  The County concluded

that MRPS was in compliance with the permit, but the State of Michigan disagreed.  In a

"Second Violation Notice" dated March 8, 2010, the Michigan Department of Natural

Resources and Environment cited several continuing violations of the permit at MRPS,

including out-of-commission basin flushing systems and the failure to clean basins of

sludge.  Pl.'s Br. Supp. Mot. Summ. J. Ex. J at 1.  The notice also referred to new

8

violations, citing two storm pumps, a dewatering pump, and an aeration system that were not operating.  *Id.*  According to an "Enforcement Notice" presented by Plaintiff, many of these violations had not been addressed as of March 2, 2011.  Pl.'s Br. Supp. Mot. Summ. J. Ex. K.  These equipment failures were included among those cited in Plaintiff's memo. Thus, Plaintiff reasonably believed that the County had violated the law.

Plaintiff may not have made his report to the Drainage Board as he had intended, but he nevertheless reported to a "public body" within the meaning of the statute.  A "public body" includes "[a] county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal corporation, or a board, department, commission, council, agency, or any member or employee thereof." Michigan Compiled Laws § 15.361(d)(iii).  Plaintiff distributed his memo to individuals employed by Wayne County and the cities of Harper Woods and Grosse Pointe Woods. These employees fall within the scope of the statutory definition.  The statute's language does not limit its protections to reports made to the intended public body, and the Court can see no reason to impose such a constraint where the legislature did not do so.

Defendants argue that Plaintiff's claim fails because the State, County, and Drainage Board were already aware of the information Plaintiff reported.  They assert, without any supporting authority, that "[t]he whistleblower bears the burden of establishing that he was justified in believing that a report to the public body was necessary."  Defs.' Reply Br. 3. The Court is unaware of any case law imposing this burden, and the statute's language certainly does not do so.  This requirement would actually conflict with the purpose of the WPA, as theoretically, only the first employee to report a suspected violation would enjoy

9

the statute's protections.  Absent some indication that the legislature intended such narrow protection, the Court will apply the statute as it was enacted.

Defendants assert that even if Plaintiff could make his prima facie case, they have shown a legitimate reason for terminating his employment.  They contend that Plaintiff made false claims, but a plaintiff need not establish the truth of his allegations to prevail under the WPA.  *See Melchi*, 597 F. Supp. at 583 (the legislature's decision to protect reporting of "suspected violations" encourages employees to report violations, and the statute's purpose would be thwarted if employees were subject to reprisal where it is ultimately shown that the employer did not violate the law).  Furthermore, the State of Michigan's violation and enforcement notices indicate that Plaintiff's allegations were not entirely baseless.  The County's investigation summary also conceded that many of Plaintiff's allegations were true, albeit misleading in the context presented.  Defendants claim that Plaintiff's termination was justified by conduct that conflicted with the County's interest, but they have failed to demonstrate precisely how the reporting of equipment issues at MRPS was detrimental to the County.

Plaintiff has established protected activity under the WPA, as he reasonably believed that the County's conduct violated the law and reported the suspected violation to a public body.  Plaintiff's termination notice clearly provides that he was discharged because of this activity.  The Court therefore concludes that Plaintiff must be granted summary judgment on his WPA claim with respect to the issue of Defendants' liability.

The Court notes that there is evidence indicating that Plaintiff's motives were not entirely altruistic.  For example, Plaintiff's memo recommends regular meetings between

management and employees, and asks why the County is not accountable to its employees. These matters cannot be considered anything but employment gripes. Defendants have also presented testimony indicating that Plaintiff's reporting of violations was motivated in part by dissatisfaction with recent organizational changes. However, where the primary focus of the employee's communication is the suspected violation of the law, as the Court believes is the case here, the employee may still obtain relief. *Melchi*, 597 F. Supp. at 586. In such instances, courts have factored the plaintiff's mixed motives into the determination of damages. *See id.* The jury should therefore be permitted to hear evidence of Plaintiff's personal motives for raising the suspected violations and factor those motives into their determination of damages.

## B. First Amendment Retaliation Claim

"While public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment, a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (citations omitted). "Therefore, in determining whether a public employer has violated the First Amendment by firing a public employee for engaging in speech, the Supreme Court has instructed courts to engage in a three-step inquiry." *Id.* First, the Court must determine whether the speech addressed a matter of public concern. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 143, 103 S. Ct. 1684, 1688 (1983)). This is a question of law for the Court to resolve, although there may be factual questions for a jury if it is disputed what words were specifically stated. *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180

(6th Cir. 2008). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48, 103 S. Ct. at 1690. "Matters of public concern include speech that 'relates to any matter of political, social, or other concern to the community.'" *Rodgers*, 344 F.3d at 596 (quoting *Connick*, 461 U.S. at 146, 103 S. Ct. at 1690). "[S]peech falling into this category includes informing the public that a governmental entity failed to 'discharge its governmental responsibilities.'" *Id.* (quoting *Connick*, 461 U.S. at 148, 103 S. Ct. at 1690). It does not matter if the employee's suspicions were incorrect, so long as the statements were of public concern and not false statements deliberately or recklessly made. *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007). "The inquiry is primarily concerned with what the speaker intended to communicate through his statement, and not his reasons for speaking." *Taylor v. Keith*, 338 F.3d 639, 645 (6th Cir. 2003) (citing *Chappel v. Montgomery Cnty. Fire Protection Dist. No. 1*, 131 F.3d 564, 575 (6th Cir. 1997).

"Along these lines, the Supreme Court has emphasized that the employee must be speaking as a citizen, not as an employee for personal interest purposes." *Rodgers*, 344 F.3d at 596. A public employee speaking pursuant to his official responsibilities is not speaking as a citizen, and his speech is therefore not constitutionally protected. *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960 (2006).

If the speech addressed a matter of public concern, the Court must "balance the interests of the public employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the

public services it performs through its employees.'" *Rodgers*, 344 F.3d at 596 (quoting

*Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35 (1968)). The

application of the *Pickering* balancing test is a matter of law for the Court to decide.

*Hughes*, 542 F.3d at 181.

"Finally, the court must determine whether the employee's speech was a substantial

or motivating factor in the employer's decision to take the adverse employment action

against the employee." *Rodgers*, 344 F.3d at 596 (citing *Mt. Healthy City Sch. Dist. Bd. of

Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977)). "[T]he employee must

'point to specific, nonconclusory allegations reasonably linking her speech to employer

discipline.'" *Id.* at 602 (quoting *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 602 (6th

Cir. 2002)).

The evidence in this case indicates that Plaintiff's speech involved a matter of public

concern and was entitled to First Amendment protection. Plaintiff's statements addressed

the operational capability of a sewage pumping facility. This is obviously of concern to

local residents, whose basements could be flooded in the event of an equipment failure.

Plaintiff called attention to equipment failures that apparently constituted violations of

state environmental regulations, and "[p]ublic interest is near its zenith when ensuring that

public organizations are being operated in accordance with the law." *Marohnic v. Walker*,

800 F.2d 613, 616 (citing *Connick*, 461 U.S. at 149, 103 S. Ct. at 1691).

Defendants argue that Plaintiff was not speaking as a citizen, but the Court disagrees.

Plaintiff may have intended to advance his own interests through the memo, but his motive

is only one factor to be considered in determining whether his speech may be

13

characterized as relating to a matter of public concern.  *Chappel*, 131 F.3d at 576.

Personal motivation can exempt speech from First Amendment protection where it so

dominates the substance of the speech that the "point" or "communicative purpose" of the

speech becomes a matter of merely personal concern.  *Id.* at 574-75.  "Whether an

employee's statement is predominated by 'the employee's personal interest *qua* employee'

is primarily a content-based inquiry, not an exclusively motive-based inquiry."  *Id.* at 575

(quoting *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989)).  Although the

evidence suggests that Plaintiff was personally motivated to criticize the County's

management of MRPS, the Court cannot conclude that expression of an employment gripe

was the point of Plaintiff's speech.  The first eleven of the fourteen points in Plaintiff's

memo address equipment failures, several of which apparently constituted violations of

environmental regulations.  Only the final three points question unrelated contracting

decisions and the alleged lack of accountability by management.  While Plaintiff's critical

attitude toward management is clear, it does not dominate the substance of his speech to

the extent necessary in order to trigger the loss of First Amendment protections.

Plaintiff's claim is not barred by *Garcetti*, as Defendants argue, as he did not speak

pursuant to his official job duties.  Plaintiff attended the meeting during his vacation time,

and there is no indication that his position required him to attend board or budget meetings

or otherwise raise concerns to MRPS customer communities.  It is irrelevant that Plaintiff

conveyed knowledge gained through his employment.  The Supreme Court has made clear

that the public has a right to hear public employees' views even on matters related to their

employers, as "[p]ublic employees are 'the members of a community most likely to have

14

informed and definite opinions' about a wide range of matters related, directly or indirectly, to their employment." *Borough of Duryea v. Guarnieri*, --- U.S. ----, 131 S. Ct. 2488, 2500 (2011) (quoting *Pickering*, 391 U.S. at 572, 88 S. Ct. at 1736).

The Court next considers the *Pickering* balancing of interests, and concludes that it weighs in Plaintiff's favor. This balancing of interests has been found to weigh in favor of protecting public employees' speech where there is no indication that the speech impeded the employee's ability to perform job duties or otherwise interfered with the employer's operation. *See Pickering*, 391 U.S. at 573, 88 S. Ct. at 1737. Here, Plaintiff has presented testimony of Butler Benton, Jr., stating that the memo did not cause embarrassment for the County. *See* Arbitration Tr. 515. Defendants have also failed to identify any disruption of operations resulting from the memo. There is no evidence before the Court indicating that Plaintiff's speech impeded his ability to perform his job duties as a mechanic. Although Defendants have a general interest in ensuring that the County's operations are viewed as efficient and effective, the Court concludes that this interest is not so great as to justify limiting employees' contributions to public debate. Statements by public employees on matters of public concern "must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors." *Pickering*, 391 U.S. at 574, 88 S. Ct. at 1737.

Finally, it cannot be reasonably debated that Plaintiff's speech was the motivating factor for his termination. Plaintiff's termination notice specifically cites his conduct at the July 1 budget meeting as the reason for his termination. *See* Pl.'s Br. Supp. Mot. Summ. J. Ex. F. The Court therefore concludes that Plaintiff has established Defendants'

liability under 42 U.S.C. § 1983 for First Amendment retaliation.

## IV. Conclusion

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment is **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for partial summary judgment

with respect to the issue of liability is **GRANTED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:

Richard G. Mack, Esq.
Keith D. Flynn, Esq.
Cheryl Yapo, Esq.